IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | NO. 3:05-cr-00096 |
| v. | ) | |
| | ) | JUDGE RICHARDSON |
| | ) | |
| USIAMRIN CHALEUNSAK | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

The Court is in the midst of adjudicating the Superseding Petition for Warrant for Offender on Supervision (Doc. No. 64, "Superseding Petition"). As noted in the Superseding Petition, Defendant, Usiamrin Chaleunsak, is currently serving a six-year term of supervised release, following his release after serving a 160-month sentence[1] based on his conviction of five felony counts: four counts of distribution of MDMA, a Schedule I controlled substance, within 1,000 feet of a public elementary, vocational or secondary school, in violation of 21 U.S.C. §§ 841(a)(1) and 860; and one count of possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c). The Superseding Petition claims that Defendant violated one of his conditions of supervised release: that he commit no federal, state or local crime.

Pending before the Court is the Government's "Motion for Revocation of Release Order" (Doc. No. 68, "Motion to Revoke"). In the Motion to Revoke, brought under 18 U.S.C. § 3145(a)(1), the Government seeks revocation of the magistrate judge's March 25, 2020 Order (Doc. No. 70, "Release Order") releasing Defendant pending a final hearing on the Superseding

---

[1] Defendant's sentence originally was 181 months, (Doc. No. 34), but thereafter was reduced to 160 months (120 months on Counts One through Four to run consecutive to 60 months on Count Five) pursuant to 18 U.S.C. § 3582(c). (Doc No. 54).

Petition, which was issued after a combined detention hearing and preliminary hearing held that same day.

The magistrate judge stayed her Release Order for 24 hours, and upon motion of the Government (Doc. No. 67), the undersigned district judge extended the stay pending the parties' respective briefing on the Motion to Revoke. (Doc. No. 71). Defendant thereafter filed a belated response to the Government's request to extend the stay, (Doc. No. 72), which the undersigned treated as a motion to dissolve the emergency stay before denying such motion. (Doc. No. 73). After a transcript of the March 25 hearing was prepared and filed, (Doc. No. 74), the Government filed its brief in support of the Motion to Revoke (Doc. No. 75), and Defendant filed his brief in opposition to the Motion to Revoke (Doc. No. 76). The Court has read the transcript, all briefs, and the Petition for Warrant for Offender on Supervision.

BACKGROUND

For purposes of the Motion to Revoke, the Court will accept as true all facts to which a defense witness testified.

As for the testimony of Government witnesses, the Court will accept it as true only to the extent that its veracity was not reasonably placed in doubt and it is not inherently dubious. This means, among other things, that the Court will not accept as true certain details to which Government witness Carlos Martin testified but, based on his lack of his personal knowledge, he could have misapprehended and/or could not substantiate. Such details will be disregarded, and the Court will accept any particular fact asserted via Martin's testimony only if the Court concludes that (a): Martin was unlikely to have misunderstood the fact when originally receiving the

information second-hand;[2] (b) Martin was unlikely to have inaccurately conveyed in his testimony the fact as he originally received it second-hand from an investigating detective; (c) the detective was unlikely to have misperceived (or made up) the fact; and (d) the fact either was not challenged by counsel for Defendant or was affirmatively elicited by counsel for Defendant on cross-examination.[3]

Most of the salient facts were provided at the hearing by Martin, who described himself as employed by the Bureau of Alcohol, Tobacco, Firearms and Explosives and also a Task Force agent with the Drug Enforcement Administration. As Agent Martin conceded, his testimony was based solely on reviewing the report of, and speaking with, one of the investigating MNPD officers, Clayton Oliver.[4] Based entirely on second-hand information, Agent Martin testified to the facts set forth in the following two paragraphs (as supplemented with obvious inferences to be drawn from Agent Martin's testimony), which the undersigned accepts as true for purposes of the Motion to Revoke based on those facts satisfaction of the Court's above-stated criteria.

On March 12, 2020, Metro Nashville Police Department ("MNPD") officers responded to a call indicating a possible home invasion at 1345 Bell Road, Unit 302 ("Unit 302"). The call was

---

[2] Martin was clear that he relied on a written police report, apparently as his primary source of information. Thus, cross-checking his testimony against the report serves to help the Court assess this first criterion. Notably, however, Agent Martin indicated that he also had spoken with the author of the report (Clayton Olive or Oliver), and so his testimony might have been based on such discussions and not just the report; the discussions could have supplemented, clarified or corrected Olive(r)'s version of events as reflected in the report. This, plus the fact that the report was not offered as an exhibit at the hearing, (*see* Doc. No. 69-1), even though it appears elsewhere in the record of this case, persuades the Court to make factual determination based solely on Agent Martin's (and the other witnesses') testimony and not directly on the report.

[3] Counsel for Defendant implied certain facts via leading questions on cross-examination. But of course attorney's questions are not, in any context, evidence, and to the extent alleged facts were implied in counsel's question(s) but not confirmed by the witness being questioned, such alleged facts will be disregarded.

[4] The transcript of the hearing indicates that Agent Martin gave the surname as "Oliver." (Doc. No. 74 at 62). But the police report, which was attached to the Superseding Petition, (Doc. No. 64 at 8-10), shows the author's last name as "Olive."

not initiated by anyone at 1345 Bell Road (including Unit 302), but rather by someone else.[5] Upon responding to the call, MNPD officers found evidence of a shooting. A homeowner's association video of the shooting exists, and Defendant's girlfriend (the below-referenced Ms. Pham) can be seen in the video.

Several days passed, during which time MNPD was prioritizing its response to the deadly tornado that had recently hit parts of Nashville. Then, finally following up on March 17, MNPD detectives went to Unit 302, where they saw two parked vehicles that each turned out to be registered to Defendant. The detectives knocked on the door. A Ms. Pham answered. Detectives advised her that they were following up on the (apparent) home invasion of March 12 and asked whether they could come inside.[6]

Once inside, the detectives explained that while knocking on the door, they had heard movements, and Ms. Pham explained that her boyfriend lived at the residence with her and was upstairs showering[7] at the time.[8] The detectives told her that they had received a tip there were

---

[5] There is nothing in the record to suggest the identity of the caller or that the caller was ever identified, or later interviewed, by MNPD.

[6] Agent Martin did not testify as to whether Ms. Pham gave the detectives permission to enter, and the undersigned will not infer that she gave knowingly and voluntarily did so, even though this seems not necessarily unlikely. But in any event, the existence and validity of her consent is not at issue on the Motion.

[7] The fact that Defendant was showering at his girlfriend's residence obviously is hardly conclusive proof that, contrary to his denials, he resided there. But all other things being equal, it tends to support the conclusion that he resided there.

[8] The undersigned does not credit any insinuation that Defendant was "running" in the house, for several reasons. First, as for the movements the detectives claim to have heard at the door, the movements could have been those of Ms. Pham coming to the door; nothing whatsoever in Agent Martin's (non-specific) testimony on this point suggests that such movement was more likely Defendant's rather than Ms. Pham's. And as for the detectives' characterization of the movement as "running," this is precisely the kind of detail that the undersigned will not credit, because Agent Martin's second-hand characterization easily could have been based on a misunderstanding of the detective's characterization and because the undersigned would need to know the basis for such characterization before accepting it is true—especially since, contrary to Agent Martin's testimony, Olive(r)'s report says nothing about "running" and, for that matter, describes movement as being heard only *as* the detectives entered the house after their initial conversation with Ms. Pham. Moreover, Ms. Pham's explanation for the movement does not suggest "running." And in any event, there would limited probative value in the (purported) fact that Defendant was running in the house.

"possible narcotics" at the location, then asked whether they could walk through the house.[9] Then, walking through the kitchen, they noticed on the kitchen counter, a money counter, digital scales, and vacuum bag sealer—items that, in Agent Martin's experience, collectively indicate (albeit not conclusively) actual drug sales.[10]

Walking upstairs, the detectives started to smell a strong odor of marijuana. Once on the top floor, Ms. Pham opened the door to the master bedroom, where the detectives saw Defendant, who was shirtless before putting on a shirt he had grabbed from a dresser. Detectives did not know his name, and when they asked him what it was, he responded that it was "Lynn" (phonetic).[11] In the closet of master bedroom, the detectives noted a gun safe and men's clothing. They also saw Defendant's driver's license on the mirror of the same dresser.

In response to detectives' questioning, Defendant stated that he had just smoked marijuana in the bathroom, which (according to Defendant) accounted for the detectives' smelling of marijuana. Contrary to Ms. Pham, Defendant stated that he did not live there. Accordingly, the detectives asked (only) Ms. Pham for consent to search the residence, which she gave (at least insofar as she signed a consent form). Asked by detectives to open the gun safe, Ms. Pham stated that she had in the safe large sums of currency, which (according to her) was from her nail salon business. Upon opening the safe, detectives found approximately $187,000 in U.S. currency, three pistols, and an AK style rifle. They also found an application form showing that Defendant was

---

[9] Again, Agent Martin's testimony does not indicate—and the undersigned will not infer—that Ms. Pham gave any consent, let alone knowing and voluntary consent, to the detectives' request. But again, the existence or validity of such consent is not here at issue.

[10] The Court has little difficulty crediting Agent Martin's statement here, agreeing that collectively these items are indicative (though not conclusive proof) of drug trafficking.

[11] The Court does not take Defendant's answer to be nefarious in any way; the Court presumes this was a short nickname used in place of a longer, Laotian name.

trying to apply for a driver's license or some other form of identification. They also found in the safe an envelope with Defendant's name written on the outside,[12] although Agent Martin was unaware of the contents (if any) of this envelope.

Detectives next searched the attic, where they found approximately 27 pounds of marijuana.

The record reflects that Agent Martin's testimony was challenged by defense counsel generally on the grounds that, as Agent Martin admitted, he had only second-hand knowledge. There was no suggestion or indication, however, that Agent Martin did not accurately convey his belief as to the applicable facts as informed solely by second-hand knowledge. And cross-examination did not suggest or indicate that the Martin's testimony as to any of facts set forth above was materially inaccurate in any way.

After Agent Martin concluded his testimony, the Government called Jeffrey Schmidt. The undersigned, based on his above-stated principles for accepting or not accepting testimony as true for purposes of the Motion, finds the following facts from the testimony of Schmidt (as construed in light of obvious inferences drawn from such testimony).

Schmidt is the United States Probation Officer ("USPO") assigned to supervise Defendant since his term of supervised release effectively started on September 19, 2017.[13] Schmidt obtained a 1099 tax form, issued by a nail salon in Murfreesboro, Tennessee, reflecting income of $45,251 for 2019 from part-time work there. He learned at some point that MNPD seized Defendant's bank account, which contained approximately $99,000. He has been testing Defendant for the presence

---

[12] The Court construes Agent Martin as meaning that Defendant's full name, and not just his nickname, "Lynn" (phonetic), was written on the envelope.

[13] Supervision of Defendant would have started in January 2017, but it was delayed due to Defendant being in custody pursuant to a detainer from Immigration and Customs Enforcement (ICE) before being released because his native country, Laos, would not take him back.

of controlled substances, including marijuana, in Defendant's system and Defendant has never tested positive. The address Defendant had listed with USPO Schmidt was not Unit 302, but rather an address on Camille Street where, Defendant advised USPO Schmidt, Defendant was living with Ms. Pham.

Defendant's supervision involved filling out a monthly report. It also involved drug testing from time to time. Defendant was tested on March 20, 2020, and the results were negative. Defendant's supervision did not involve any required trips to the Probation Office, but it did involve USPO Schmidt making trips to the Camille Street address—to where Defendant moved in with Ms. Pham some time in 2019—on a monthly or bi-monthly basis. When USPO Schmidt went to the Camille Street address, sometimes Defendant would be there; if Defendant was not, then typically USPO Schmidt would call Defendant, who might reportedly be at the nail salon, and ask him to come to the Camille Street address. The house there seemed unusually empty, not having a lot of "things" in it, but otherwise USPO Schmidt did not encounter issues when he walked through it. As for the total number of home visits since September 2017, USPO Schmidt estimated ten, and in most cases Defendant was not home at first but was at work, with his girlfriend, or visiting his kids; USPO Schmidt would have to call Defendant home, and Defendant would promptly comply.

The record reflects no challenge at all to the veracity of USPO's version of events.

After USPO Schmidt concluded his testimony, Defendant called three witnesses. As Defendant summarized their testimony:

> [The testimony provided] a volume of favorable information about his character, his temperament, and his long-standing connection to the community. The consistent testimony of all of the witnesses offered by Mr. Chaleunsak portrayed him as a loyal, peaceful, good-hearted friend and brother. His longtime friends, Randy Humphries and Bo Boupharath, who have known him for 17 and 23 years, respectively, maintained close contact with Mr. Chaleunsak while he was incarcerated in the Bureau of Prisons. His sister and her husband, who are both employed full-time but work different shifts, offered to serve as third-party

custodians to further assure Mr. Chaleunsak's appearance and the safety of the community. Mr. Chaleunsak's sister confirmed his entry into this country as a refugee. On February 19, 1980, at age six months, Mr. Chaleunsak entered the United States with his family as a refugee in order to escape the communist regime installed in Laos in 1975.

(Doc. No. 76 at 3-4) (citations omitted). The Court accepts as valid this recounting of Defendant's witnesses' testimony, which is a fair and accurate synopsis. But it does not reflect some additional information—or at least confirmation— provided by these witnesses on cross-examination. For example, Randy Humphries and Bo Boupharath each confirmed that Ms. Pham was Defendant's girlfriend, with Mr. Boupharath describing them as together as a couple all the time. Randy Humphries testified that he was unaware of Defendant having any legal employment other than at the nail bar.

Finally, the Court notes that, in the Superseding Petition, as in his testimony at the hearing, USPO Schmidt avers that according to MNPD, it froze Defendant's bank account, which had an estimated total of $99,000.00. Further according to his Superseding Petition, USPO Schmidt was advised by MNPD that it also seized two vehicles belonging to Defendant, a 2013 Ford Taurus and a 2010 Infiniti G37. The Court credits this sworn (albeit second-hand) information from the Superseding Petition because the Probation Officer is unlikely to have misapprehended the information that MNPD was conveying to him, and MNPD is highly unlikely to have (intentionally or unintentionally) gotten the information wrong on the front end. And Defendant has not disputed the accuracy of this information. Accordingly, for purposes of the Motion, the Court accepts that Defendant had approximately $99,000 in a bank account and that he owned these two vehicles (which very likely were the two vehicles reportedly found parked outside Unit 302 on March 17, 2020).

At the conclusion of the detention/preliminary hearing, the magistrate judge found (for purposes of the preliminary hearing) probable cause to believe that the supervised release violation alleged in the Superseding Petition had occurred, *i.e.*, that Defendant had violated the condition that he commit no federal, state or local crime. Moving on to the issue of detention or release, the magistrate judge noted that detention was statutorily mandatory unless she found by clear and convincing evidence that (at least with appropriate conditions) Defendant was not likely to flee or pose a danger to other persons or the community. Ultimately, she made this finding, conditioned upon the following special conditions of release: (1) living with his sister; (2) being subject to location monitoring; and (3) having no contact with Ms. Pham, his co-defendant in the related pending case in state court.

This Motion then followed in the manner discussed above.

## LEGAL STANDARD

"The default position of the law . . . is that a defendant should be released pending trial." *United States v. Stone*, 608 F.3d 939, 945 (6th Cir. 2010); *see also United States v. Salerno*, 481 U.S. 739, 755 (1987) ("In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception.") Thus, a defendant may be detained pending trial (or, in this case, a final hearing on a supervised release violation petition) only if the Court finds that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1). Generally, the Government must prove dangerousness to any other person or the community by clear and convincing evidence. *United States v. Hinton*, 113 F. App'x 76, 77 (6th Cir. 2004). By contrast, the Government must prove risk of flight only by a preponderance of the evidence. *Id.* But there are exceptions to the rule placing this high burden on the Government, and one of them

applies here: pending a final hearing on a supervised release violation petition, "the burden of establishing by clear and convincing evidence that the [defendant] will not flee or pose a danger to any other person or to the community rests with the [defendant]." Fed. R. Crim. P. 32.1(a)(6). The Court will assume that Defendant satisfies the former requirement, *i.e.*, has established by clear and convincing evidence that he does not pose a risk of flight; thus, the Motion to Revoke turns on the latter requirement, Defendant's burden to establish by clear and convincing evidence what the Court will refer to for short as an "absence of dangerousness."

In determining whether there are conditions of release that will reasonably assure an absence of dangerousness, the Court must consider the following factors: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the person;[14] (3) the history and characteristics of the person; (4) whether the defendant was on probation, parole, or other release at the time of the current offense; and (5) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. 18 U.S.C. § 3142(g).

"Review of the Magistrate Judge's decision is de novo, 'although the district court "may conduct its review and base its decision on the evidence presented to the magistrate at the detention hearing.""" *United States v. Zapien*, No. 3:14-CR-00037-1, 2014 WL 1028435, at *2 (M.D. Tenn. Mar. 17, 2014) (quoting *United States v. Stokes*, No. 3:06-cr-00204, 2006 WL 3843589, at *1 (M.D. Tenn. Dec. 22, 2006) (citation omitted)).

---

[14] This factor "goes to the weight of the evidence of dangerousness, not the weight of the evidence of the defendant's guilt." *Stone*, 608 F.3d at 946-47. But insofar as dangerousness here is based in part of Defendant's alleged violation of supervised release, the weight of the evidence of Defendant's culpability for that violation goes directly to the weight of the evidence of dangerousness.

<u>ANALYSIS</u>

As noted above, the magistrate judge found probable cause to believe that Defendant committed the violation alleged in the Superseding Petition, *i.e.*, committed a federal, state or local crime. The undersigned agrees, but wishes to go further and discuss in some detail both the nature of the crimes as to which probable cause exists, and the strength of the reasons to believe that Defendant committed them. As the undersigned sees it, based on the current record,[15] there is a substantial likelihood that Defendant committed (at the very least) two particular Tennessee state crimes and the federal version of those same two crimes, namely: (1) possession of marijuana with intent to distribute; and (2) possession of a firearm by a convicted felon. This is vital because, as explained further below, once this conclusion is drawn, is becomes very difficult—even in the mind of a jurist like the undersigned who is considering all relevant factors—for Defendant to meet his burden of showing an absence of dangerousness.

In the Court's view, the analysis is straightforward. It is almost certain that either Defendant or Ms. Pham, or both them jointly, possessed each of the following, respectively: (a) the four firearms found in the safe; (b) the $187,000 cash found in the safe; (c) the 27 pounds of marijuana in the attic; and (d) the items found in the kitchen (appropriately) associated by Agent Martin with drug trafficking. It is similarly very likely that whoever possessed the marijuana was possessing it to distribute, using the items from the kitchen as tools of the trade as needed.

So the questions are whether Defendant (jointly or by himself) possessed the firearms, owned the cash, and possessed the marijuana (in conjunction with the items found in the kitchen).

---

[15] Everything in the Court's analysis of the evidence is based on the current record only. The Court realizes that the record conceivably could look substantially different at the conclusion of the final hearing on the Superseding Petition. This means, among other things, that despite the emphatic nature of the Court's view of the current record, the Court has and will keep an open mind as to whether the Government ultimately meets its burden of proof by a preponderance of the evidence at the final hearing. And the Court certainly has no intention, and would never presume, to opine on whether the prosecution could meet its heavy burden of proof in the state criminal case the Court understands is ongoing.

To the extent that the answer is yes in every case, then there is a likelihood (and not merely probable cause) that Defendant committed the serious felonies of possession of a firearm by a convicted felon and possession of marijuana with intent to distribute it. And there is a substantial likelihood that the answer is yes in each case.

Take the firearms, for example. The record reflects that they were found in Unit 302, the residence of his girlfriend, with whom he was largely inseparable. There is every reason to believe he was living there: the sparseness of furnishings in the house he reported to USPO Schmidt as his residence; the presence of *two* of his cars parked in front of Unit 302; and the presence of male clothing and his driver's license in the master bedroom suite. And in the safe found in the closet in that suite, officers found two documents with his name on them. All of this is sufficient to reflect a substantial likelihood that he was the custodian of the safe and possessed the evidentially significant items in it: the four firearms and the $187,000 cash. This necessarily entails, of course, a substantial likelihood that he committed the felony state and federal offenses of possession of a firearm by a convicted felon.

But Defendant's likely possession of the cash is also probative. Specifically, as unexplained wealth, Defendant's cash is indicative of drug trafficking. Before reaching the $187,000, one can start with the [approximately] $99,000 in Mr. Pham's bank account. There is no question that it is almost entirely unexplained wealth. The record reflects that Defendant was employed only part time at a nail salon, and reflects only a single years' earning, of only $45,000. Moreover, Defendant was released from custody, after a lengthy prison term and then months in ICE custody, only in September 2017. And the Court takes judicial notice of the fact that while in prison, on or about April 11, 2007, he filed a motion for relief under 28 U.S.C. § 2255 (Case No. 3:07-cv-00416), accompanied by a motion to proceed in forma pauperis ("IFP motion") that he

declared under penalty of perjury to be true.[16] In the IFP motion, he swore that he owned (only) $200.99 in cash and owned no real estate, stocks, bonds, notes, automobiles, or other valuable property (excluding ordinary household furnishings and clothing). He also stated that he had no source of income beyond $1600 his family had provided him the preceding 12 months. This all means that Defendant, unless he perjured himself before this Court, would have had to have somehow accumulated roughly $99,000 in cash in his last ten and a half years in custody and first two years out of prison. Beyond $45,251 of income (much or all of which would be needed, if Defendant is like most people, to defray life expenses for himself and perhaps his children) from a part-time job in one year, the record provides no indication as to how this possibly could have occurred legitimately.

Still less is there an indication as to how Defendant could have obtained an additional $187,000 that there is substantial reason to believe was his. The Court does not presume to say conclusively that it belonged to Defendant rather than Ms. Pham, who, after all, did claim the $187,000, albeit not without possible motive (such as a desire to shift suspicion off her boyfriend, the one with a serious drug trafficking conviction on his record) to make such claim falsely. But given Defendant's clear connection to the guns in the safe (a connection that is even clearer in light of the paragraph following the next paragraph), there is a substantial likelihood that he possessed it, either alone or in some sort of joint fashion with Ms. Pham based on a mutual understanding.

---

[16] The Court notes that it would not use Defendant's IFP motion against him if it was part of the process of obtaining appointed counsel to which he is constitutionally entitled if indigent, for fear of chilling Defendant's constitutional rights. However, "[c]ourts have consistently held that Petitioners have 'no right to counsel in the prosecution of a § 2255 motions.'" United States v. Simpson, No. CIV.A. 6:09-7065-DCR, 2011 WL 93758, at *1 (E.D. Ky. Jan. 10, 2011) (quoting *Brown v. United States,* 20 F. App'x 373, 375 (6th Cir2001)).

Not even Defendant asserts that there is a colorable explanation for this wealth, be it cash in the approximate amount of $99,000 or cash in the total approximate amount of $286,000.[17] Still less does he identify what that source is. And this unexplainable wealth likely would be admissible even at trial to support an inference that Defendant was involved in drug trafficking.[18] It is certainly appropriately considered for this purpose on this pre-hearing Motion.

As to the key issue of whether Defendant, as opposed to Ms. Pham exclusively, possessed the firearms, the Court appropriately can and does rely on the fact that Defendant has a prior

---

[17] Instead, Defendant is relegated to asserting that the Government disingenuously argued that the $99,000 suggests that Defendant underreported his income for 2019. But whether the Government made this argument, and whether it was a persuasive argument, is beside the point. What matters is not whether Defendant *reported* (to the Internal Revenue Service) *all of his income for 2019*. What matters is whether he had a legitimate source for the $99,000, no matter the year(s) in which it was obtained or whether it was reportable to the IRS as income in any year. And, as discussed here, the record is entirely devoid of any evidence of a legitimate source.

[18] In *United States v. Jackson-Randolph*, 282 F.3d 369 (6th Cir. 2002), the court took "guid[ance]" from the Seventh Circuit's opinion in *United States v. Penny*, 60 F.3d 1257 (7th Cir.1995), which, as described by *Jackson-Randolph*, held that:

> unexplained wealth is probative and admissible if it creates an inference of a defendant's involvement in drug trafficking. *Id.* at 1263. The prosecution may present such wealth evidence, however, only "as long as other evidence, mainly that the wealth was not derived from legitimate sources, is presented to support the charge." *Id.* In addition, to be relevant and admissible, the lifestyle evidence "must relate to wealth acquired during the period in which narcotics trafficking occurred." *Id.* (citations omitted).

*Id.* at 378 (some citations omitted).

> Embracing *Penny*, the Sixth Circuit in *Jackson-Randolph* continued:

> We think that these are good markers, modified to apply in the instant case. That is, the unfair prejudice does not outweigh the probative value if three factors are met: (1) there is other credible evidence, direct or circumstantial, of the illegal activity; (2) the money spent was not available to the defendant from a legitimate source; and (3) the accumulation of great wealth or extravagant spending relates to the period of the alleged illegal activity. Then the evidence would have been properly admitted to demonstrate, not just motive, but also a likelihood that the extra wealth came from illegitimate sources and to support an inference that the defendant committed the alleged crime.

*Id.* It appears likely that the Government in this case could meet all three criteria for the admission at (a hypothetical) trial of evidence of Defendant's unexplained wealth as manifested by large sums of cash.

conviction for possession of firearms in violation of 18 U.S.C. § 924(c). To be clear, the Court is hesitant to inject any notion of propensity into a case; that applies to the instant non-trial context and *not* just to the trial context, which is the only environment wherein the actual rules against propensity evidence (particularly Federal Rule of Evidence 404(b)) are technically applicable. The Court here refers to Rule 404(b) prohibition against using evidence of "other [bad] acts" to prove a person's character; among other things, it prohibits employing the "once a drug dealer, always a drug dealer" kind of reasoning. *United States v. Bell*, 516 F.3d 432, 444 (6th Cir. 2008)

Nevertheless, even though Defendant's prior convictions would likely be inadmissible under Rule 404(b) at a hypothetical trial of the allegations in the Superseding Petition, they are appropriately considered in the following analysis, for several reasons. First, "[t]he rules concerning admissibility of evidence in criminal trials do not apply to the presentation and consideration information at [a detention] hearing." 18 U.S.C. § 3142(f)(2). Second, unlike the general rule in the trial context, a Defendant's "character," "past conduct," and "history" are unquestionably appropriate to consider when assessing dangerousness in connection with detention issues. S*ee* 18 U.S.C. § 3142(g)(3). This includes criminal history. *United States v. Massey*, No. 3:11-00012-33, 2014 WL 3671885, at *4 (M.D. Tenn. July 23, 2014)

Third, the Court is not using Defendant's prior history for here for classic propensity purposes, to explain that his character is such that he must have violated criminal laws as alleged in the Superseding Petition. Rather, it is using it to help it assess the relative likelihood that one person rather than a second person possessed particular items. The Court is not saying that Defendant has (illegally) possessed firearms before, so he must be the kind of person who (illegally) possesses firearms, and so he must have illegally possessed firearms in this instance. The Court realizes that the question(s) here is not whether Defendant's character is such that he

(illegally) possesses firearms and, if so, whether he acted in accordance with such character by (illegally) possessing the firearms in the safe. Instead, it is clear that *someone* possessed these firearms. The question is one of *identity*. That is, *who* possessed the firearms—Defendant or Ms. Pham (or both jointly)? On the issue of the identity of the possessor(s), the undersigned, as factfinder, is entitled to and will take into account that Defendant has possessed firearms in the past (albeit in the relatively distant past, as far as the record reflects), and in fact has possessed them in the past in furtherance of drug trafficking activities, while there is no similar information suggesting the same about Ms. Pham.

The same goes for the large stash of marijuana found in the attic. The Court is not saying that Defendant has trafficked in illegal drugs before, so he must be the kind of person who traffics in illegal drugs, and so he must have been trafficking drugs in this instance by possessing marijuana. The Court realizes that the question(s) here is not whether Defendant's character is such that he traffics in illegal drugs and, if so, whether he acted in accordance with such character by, among other things, possessing the marijuana with intent to distribute it. Instead, it is clear that *someone* possessed this marijuana. The question is one of *identity*. That is, *whose* marijuana was it—Defendant's or Ms. Pham's (or both of theirs, jointly)? On the issue of the identity of the possessor, the undersigned, as factfinder, is entitled to and will take into account that Defendant has distributed (and therefore necessarily possessed with the intent to distribute) illegal drugs in the past (albeit the relatively distant past), while there is no similar information suggesting the same about Ms. Pham.

In short, in seeking to identify the possessor of (stashed) firearms and drugs as between Defendant and Ms. Pham for purposes of the Motion, the Court is permitted to and does keep in mind Defendant's past history with guns and drugs.

One additional point bears mentioning here. To the extent that the inference that Defendant possessed the firearms is particularly strong because they (unlike the marijuana found in the attic) were found together with what appeared to be his personal items (a document and an envelope), that supports the notion that he intended to distribute the marijuana found in the house where Defendant was almost surely residing. And to the extent that it is likely that Defendant was possessing the marijuana with intent to distribute it, that supports the notion that he was the possessor of the firearm. As the Sixth Circuit has explained:

> Evidence of a defendant's possession of cocaine, jewelry, cash, and merchandise lacking identification was held admissible in *United States v. Taylor,* 728 F.2d 864 (7th Cir.1984), to establish the defendant's motive for illegally possessing an unregistered firearm. *Id.* at 870–72. Conversely, weapons have been introduced in drug offense cases to establish the intent to distribute drugs, *e.g., United States v. Payne,* 805 F.2d 1062, 1065–66 (D.C.Cir.1986) (per curiam); *United States v. Arnott,* 704 F.2d 322, 325–26 (6th Cir.), *cert. denied,* 464 U.S. 948, 104 S. Ct. 364, 78 L.Ed.2d 325 (1983), on the theory that guns are "tools of the trade" in trafficking narcotics, *United States v. Marino,* 658 F.2d 1120, 1123 (6th Cir.1981).

*United States v. Hatfield*, 815 F.2d 1068, 1072–73 (6th Cir. 1987)

Finally, based on the testimony at the hearing, there is every reason to believe that Defendant was living at Unit 302 with his girlfriend, Ms. Pham. And yet he denied this to the detectives on March 17, and previously had told USPO Schmidt that he was living with his girlfriend on *Camille Street***.** It is a rational inference that he was lying about these things and was doing so because he wanted to disassociate himself from Unit 302 because he had something to hide there—perhaps the firearms and marijuana. Ms. Pham, by contrast, did not disassociate herself with anything at Unit 302 or otherwise indicate an intention to hide anything, as far as the record indicates.

To summarize, the marijuana, cash, and firearms were almost certainly Defendant's or Ms. Pham's, and there are reasons (going far beyond  Defendant's prior convictions) to associate all of such property more closely with Defendant than with Ms. Pham. Thus, it appears substantially

likely that Defendant possessed the firearms and the marijuana. And if he did, then he committed significant crimes that endanger the public. It is well established that "[s]elling drugs and possessing firearms, most probably to protect the drugs or the proceeds of drug sales, is a very dangerous situation and one that commonly results in gun violence. Thus, the circumstances surrounding Defendant's alleged prohibited possession of firearms is evidence of dangerousness." *United States v. Byther*, No. 15-CR-20224, 2015 WL 3823855, at *2 (E.D. Mich. June 19, 2015) (quotation marks and citation omitted).

That being the case, Defendant is far behind the proverbial eight-ball in meeting his burden to show the absence of dangerousness by clear and convincing evidence.

One tactic to meet that burden would be to assert that, appearances and the Court's analysis aside, there actually is reason to believe that Defendant did not possess the guns or the marijuana—that there is an innocent explanation (as to Defendant) for what the officers found. But Defendant does not do that; he does not claim that the property must belong to someone else. In fact, in his brief opposing the motion, he does not directly address the identity of the possessor(s) of the firearms and distribution-quantity of marijuana. And although Defendant put on several witnesses, none addressed this issue at all. Thus, the Court would be relegating to speculating, for no discernible reason and starkly contrary to the best information available, that it is likely that Ms. Pham and not Defendant (not even in some joint capacity) was the possessor.

Faced with this reality, Defendant puts his best foot forward, arguing that (irrespective of this reality), he still meets his burden to show an absence of dangerousness by clear and convincing evidence. His arguments are perfectly appropriate (and expected) but ultimately wholly insufficient to overcome his burden. He argues that any risk of dangerousness can be adequately mitigated by conditions of release like those ordered by the magistrate judge. The problem, though,

is that conditions do not mitigate risk—and indeed do not accomplish anything at all—unless they are *followed*. Defendant heralds his prior record of his compliance while on supervised release. True enough, he has not been accused of any prior violations of supervised release. While this is certainly preferable to the alternative, it is not at all sufficient where, as here there is every reason to believe that while on supervised release, Defendant was engaging in ongoing serious violations of multiple criminal laws before being caught. What the Court said in *United States v. Nunez*, No. CR 17-MJ-30666, 2018 WL 1026473, at *4 (E.D. Mich. Feb. 23, 2018) about prior criminal history applies here as to supervised release-violation history: "While [the defendant seeking release] does not have a criminal history, his admitted criminal conduct in this case is relevant."[19] The same is true of the observations in *United States v. Kirby*, No. 610CR15GFVTHAI1, 2018 WL 2927761, at *3 (E.D. Ky. May 23, 2018), *report and recommendation adopted*, No. 610CR00015GFVTHAI1, 2018 WL 2917361 (E.D. Ky. June 11, 2018) ("Concerning his history and characteristics, although his criminal history is minimal, the element of dangerousness in Defendant's underlying charges cannot be ignored."). So Defendant's lack of history of allegations of supervised release violations gets him only so far—particularly because he *does* have a criminal history, and not a minor one. As noted above, his criminal history reflects dangerousness. The instant case has much in common with *United States v. Bell*, 673 F. Supp. 1429 (E.D. Mich. 1987), wherein the Court noted:

> Defendant's criminal history record, coupled with his presence at 3773 Monterey, the activities at that location and defendant's conduct when the officers approached, satisfies the Court that there is clear and convincing evidence that defendant continued to involve himself in narcotics trafficking after the completion of his 1983 sentence. He therefore represents a danger to the community.

*Id.* at 1432. And of course here, the burden is on *Defendant* to show the *absence* of dangerousness.

---

[19] The Court realizes that Defendant has made no such admissions in this case. Nevertheless, the likelihood that the conduct occurred is substantial in the present case just as it was in *Nunez.*

Also, the absence of other alleged violations does not mean that no such other violations occurred, given USPO's limited ability to monitor his conduct, as reflected in USPO Schmidt's testimony. The Court does not speculate that Defendant committed other violations, but merely notes it cannot say that he has not done so.

Moreover, there is a likelihood that Defendant was not candid with his probation officer (regarding his place of residence) while on supervision. This likely lack of candor suggests increased dangerousness. *See Kirby*, 2018 WL 2927761, at *3.

In short, due in part to the substantial indication of an ongoing violation of an important condition of release, the undersigned does not have confidence that Defendant will comply with all proposed new enhanced conditions of release, or even all of the older ones. This tends to suggest to release on conditions will not be adequate to protect the public. *See United States v. Bishop*, No. 6:09-CR-10-GFVT-HAI, 2019 WL 2427964, at *5 (E.D. Ky. May 9, 2019) ("[T]he defendant presents a risk of returning to trafficking. But because he is not compliant with supervision, the only effective way to protect the public is through incarceration.") (decided in the context of a final supervised release revocation hearing), *report and recommendation adopted*, No. 609CR00010GFVTHAI, 2019 WL 2427951 (E.D. Ky. June 10, 2019).

Defendant also touts the fact that he has not tested positive on any drug tests administered by the Probation Office. Again, this is certainly preferable to the alternative, and laudable, but ultimately does not help Defendant's argument here. Instead, it proves too much. Defendant's point appears to be that his non-use of drugs reduces his dangerousness. Fair enough. But such non-use is entirely inconsistent with his explanation for the strong smell of marijuana, *i.e.*, that he was smoking marijuana; Defendant's touted non-use tends to suggest that Defendant was lying about smoking marijuana prior to the detectives encountering him. And if he was willing to falsely

"admit" a misdemeanor and supervised release violation (marijuana use), it is easily inferable that he did so to cover up something more serious—in particular, possession of marijuana with intent to distribute it. And whether or not his admission of smoking marijuana was truthful, the fact that he (and not Ms. Pham) was the one who mentioned marijuana serves to highlight the fact that Defendant was the one more likely to have something to do with the marijuana found on the premises.

Defendant also claims that the firearms are (or were) "not connected to" Defendant. (Doc. No. 76 at 4). This is inaccurate because they were found in a safe: (i) in a closet containing men's clothes; (ii) in his girlfriend's house; (iii) where she said he lives; and (iv) containing multiple documents that appear to be his. Defendant also downplays the risk posed by the firearms, stating that they "were never used." (*Id.*). It is true that the record does not indicate any use of the firearms, but it has not been affirmatively established that they were never used. The record does establish, however, reason to believe that firearms inside the house may have served a dangerous purpose. The record is unfortunately barren of details regarding the shooting at Unit 302, except to reflect that Ms. Pham was present and that neither she nor Defendant reported that they were victims of a shooting. Nevertheless, the fact that Unit 302 took incoming fire under still mysterious circumstances leads to a reasonable inference that denizens at Unit 302 needed protection (perhaps because of drug trafficking activities), which leads in turn to the reasonable inference that the firearms were not necessarily intended to go unused.[20] And to the extent that the circumstances indicate an expectation of possible use of the firearms, possession of the firearm is more dangerous. *See Byther*, 2015 WL 3823855, at *2.

---

[20] These and certain other inferences made herein are not necessarily rock-solid. But they do not have to be. Defendant bears a heavy burden, and in considering whether he has met it, the Court must consider reasonable inferences that run counter to the inferences and conclusions Defendant asks this Court to draw.

And one final point must be made about the shooting: when a district judge needs to be satisfied that a defendant's release will not endanger other persons or the community, and there was an as-yet unexplained shooting at a residence where the defendant (as well as distribution-quantity illegal drugs and four firearms) were found, it behooves the defendant to satisfy the judge (if he can) that the shooting is not indicative of future danger portended by the defendant's activities if released. Defendant did not even try to do so here, perhaps (in fairness to counsel for Defendant) because he could not do so.

Defendant also notes that Agent Martin's testimony was based entirely on second-hand information. This is a fair point and a real concern to the Court. But as the Court has explained in some detail herein, it has taken pains to filter out information that is unreliable because it was conveyed only by Agent Martin without first-hand knowledge, and to rely instead only on facts not reasonably in dispute.

Defendant also relies on the character evidence from the three witnesses that he called. Unfortunately, while helpful on the issue of risk of flight, they do not advance Defendant's position on the absence of dangerousness. As is often the case with character testimony, it was general and based on what the witness happened to know of Defendant and his activities. None of it explained at all the shooting or the items found at Unit 302, suggested in any way that Defendant had nothing to do with them, or precluded the possibility that, unbeknownst to the witness, Defendant was illegally possessing firearms as well as marijuana with the intent to distribute it.

Defendant also notes that the learned magistrate judge, who was the only to be able to assess witness credibility, found that Defendant had met his burden. The undersigned respects the magistrate judge's assessment of witness's credibility and of the evidence vis-à-vis Defendant's burden. Still more does he appreciate her scrupulous attention to the imperative to grant pre-

hearing release wherever possible. However, it is the undersigned's burden to review the detention/revocation issue de novo, without deference to the magistrate judge. In doing so, the undersigned has the advantage over the magistrate judge; he has had more time to sift through the record (including a written transcript) and the parties' arguments and to consider additional information (primarily Defendant's prior reporting of virtually no assets) that was not at the fingertips of the magistrate judge. Moreover, as alluded to multiple times above, the Court is not relying on any facts that truly depend on a favorable credibility determination as to witness testimony. The Court has credited all of the testimony of Defendant's witnesses, and it has relied on facts not reasonably in dispute for purposes of this Motion, refusing to embrace any contested facts based on a credibility determination in favor of the Government's witnesses.

In addition, the undersigned likely has, and is allowed to have, a less sanguine view than did the magistrate judge of the likelihood of Defendant's ongoing compliance with conditions of pre-hearing release. And, of course, different jurists naturally can and do have somewhat different (and mutually reasonable) notions of what "clear and convincing" means. Based on its independent review and different vantage point, the Court comes out differently on the issue than did the magistrate judge.

<u>CONCLUSION</u>

Once the straightforward determination is made that Defendant most likely illegally possessed firearms and marijuana with intent to distribute it, it follows that Defendant most likely cannot be counted on to comply with important conditions of release or to refrain from such conduct in the future, which presents a dangerous mix of contraband guns and drugs. Defendant thus faces an extremely steep challenge to show the absence of dangerousness. And the Court simply cannot find "clear[ly] and convincing[ly]" the absence of dangerousness when Defendant

leaves unaddressed the core issues relating to such dangerous: (1) what were the stashed guns and drugs doing in a place where by all indications Defendant, without admitting it, actually lived; and (2) why does the recent shooting on site at this location with guns and drugs not suggest dangerousness associated with Defendant's activities?

The Court finds that Defendant has not shown by clear and convincing evidence, as required, that he does not pose a danger to others or the community. Accordingly, the Government's Motion to Revoke (Doc. No. 68) is **GRANTED**, the Release Order (Doc. No. 70) is vacated, and Defendant shall be detained, pursuant to a separate order, pending the final hearing on the Superseding Petition, currently set for April 22, 2020.

Counsel are encouraged to email chambers jointly to discuss their views on the timing and/or manner of the holding of the revocation hearing in light of the ongoing COVID-19 pandemic.

IT IS SO ORDERED.

_Eli Richardson_
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE